COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS


| | | |
|---|---|---|
| TELESIS/PARKWOOD RETIREMENT I, LTD., TELESIS/PARKWOOD RETIREMENT, INC., TELESIS MANAGEMENT CORPORATION, PARTY DOING BUSINESS AS PARKWOOD RETIREMENT COMMUNITY, AND PARTY DOING BUSINESS AS THE TELESIS COMPANY, | § § § § § § | No. 08-13-00029-CV  Appeal from the  153rd District Court  of Tarrant County, Texas  (TC#153-242312-09) |
| Appellants, | § | |
| v. | § | |
| EDNA ANDERSON, | § | |
| Appellee. | | |

**O P I N I O N**

Appellants, Telesis/Parkwood Retirement I, Ltd, Telesis/Parkwood Retirement, Inc., Telesis Management Corporation, Party doing business as Parkwood Retirement Community (Parkwood), and Party doing business as The Telesis Company (collectively, "Telesis" or "Parkwood"), appeal a final judgment upon a jury's verdict finding Telesis' gross negligence

harmed Appellee, Edna Anderson, and awarding Edna compensatory and exemplary damages.[1] We affirm the trial court's judgment.

## PROCEDURAL BACKGROUND

Edna filed suit against Telesis alleging that on July 5, 2008, when she was 95 years' old, she collapsed in the shower area of her apartment at Parkwood Retirement Community, which is an independent-retirement community owned, controlled, and managed by Telesis. In her pleadings, Edna alleged that she was unable to get up and repeatedly pulled the cord on her apartment's emergency call system. Because no one from Parkwood responded to her calls and no one inquired about Edna's whereabouts or condition when she failed to appear for her daily mid-day meal at Parkwood on July 6, 2008, Edna remained on the floor of her apartment, naked, without food or water, and eventually in her own waste. Edna alleged that on the evening of July 6, 2008, she pulled a telephone from a desk, striking and injuring her head, and used the telephone to seek help from her family. Edna was hospitalized with injuries and diagnosed with rhabdomyolysis, a condition alleged to have resulted from these events.

In her suit against Telesis, Edna presented theories of negligence and premises liability, gross negligence and malice, misrepresentation, breaches of warranty, and product liability. Edna alleged injury and sought compensatory and punitive damages, in addition to other relief. The case proceeded to trial, and before the case was submitted to the jury, the trial court granted Telesis' motion for directed verdict on Edna's premises liability, negligent misrepresentation, and product liability causes of action, and denied the motion on her claims of negligence, gross

---

[1] As this case was transferred from our sister court in Fort Worth, we decide it in accordance with the precedent of that court. TEX. R. APP. P. 41.3.

negligence and malice, and breaches of warranty. The trial court charged the jury on Edna's theories of negligence and gross negligence. The jury found Telesis' negligence proximately caused Edna's injuries and awarded her compensatory damages totaling $636,517.03. The jury also found by clear and convincing evidence that Edna's harm resulted from Telesis' gross negligence, and awarded Edna $1,680,000 in exemplary damages. The trial court entered judgment on the jury's findings in favor of Edna and against the Telesis defendants, jointly and severally, and awarded Edna $636,517.03 in compensatory damages but reduced the exemplary damage award to $587,217.24.

## DISCUSSION

Telesis raises eighteen issues challenging the legal and factual sufficiency of the evidence supporting the jury's findings related to negligence and gross negligence. In addressing its issues, we employ these standards of review as well as those set out hereafter.

### *Standards of Review*

Whereas we provide a more deferential review of factual determinations, we review legal determinations *de novo*. *Reliance Nat. Indem. Co. v. Advance'd Temporaries, Inc.*, 227 S.W.3d 46, 50 (Tex. 2007). When addressing a challenge to the legal sufficiency of the evidence to support the jury's findings, we review the entire record, credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 822, 827 (Tex. 2005); *Henson v. Reddin*, 358 S.W.3d 428, 434 (Tex.App. –Fort Worth 2012, no pet.). We sustain a legal sufficiency challenge when, among other things, the offered evidence to establish a vital fact does not exceed a scintilla. *Kroger v. Texas Ltd. Parnership v. Suberu*, 216 S.W.3d 788, 793 (Tex. 2006), *citing City of Keller*, 168 S.W.3d at 810.

3

"When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Jelinek v. Casas*, 328 S.W.3d 526, 532 (Tex. 2010), *quoting Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex. 1983). If more than a scintilla of evidence exists to support the jury's findings, the evidence is legally sufficient. Anything more than a scintilla of evidence is legally sufficient to support the jury's finding. *Cont'l Coffee Prods. Co. v. Cazarez,* 937 S.W.2d 444, 450 (Tex. 1996). More than a scintilla of evidence exists when the evidence supporting the finding, as a whole, would enable reasonable and fair-minded people to differ in their conclusions. *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). Evidence that allows only one inference may not be disregarded by jurors or a reviewing court. *City of Keller*, 168 S.W.3d at 822.

When reviewing a challenge to the factual sufficiency of the evidence to support the jury's findings, we consider all the evidence and set aside the judgment only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). We must examine both the evidence supporting and that contrary to the judgment. *See Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 241 (Tex. 2001).

Under either type of challenge, the jury is the sole judge of the weight and credibility of the evidence, and is entitled to resolve any conflicts in the evidence and to choose which testimony to believe. *City of Keller*, 168 S.W.3d at 819. We therefore assume that jurors decided questions of credibility or conflicting evidence in favor of the verdict if they reasonably could do so. *Id*. at 819-20. We do not substitute our judgment for that of the jurors if the evidence falls within this zone of reasonable disagreement. *Id*. at 822.

4

We review an assertion that the trial court erred in submitting or refusing to submit a particular instruction to the jury under an abuse of discretion standard of review. *Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012), *citing In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000). We will not reverse a judgment for a charge error unless the error was harmful because it probably caused the rendition of an improper judgment or probably prevented the petitioner from properly presenting the case to the appellate courts. TEX. R. APP. P. 44.1(a); *Thota*, 366 S.W.3d at 687.

*Elements of Negligence*

A negligence action requires "a legal duty owed by one person to another, a breach of that duty, and damages proximately caused by the breach." *Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 404 (Tex. 2009)(citations omitted). "Liability is grounded in the public policy behind the law of negligence which dictates every person is responsible for injuries which are the reasonably foreseeable consequence of his act or omission." *El Chico Corp. v. Poole,* 732 S.W.2d 306, 315 (Tex. 1987). The existence of a duty is a question of law for the court to decide from the facts surrounding the occurrence in question. *Tri v. J.T.T.,* 162 S.W.3d 552, 563 (Tex. 2005); *see also Nabors Drilling, U.S.A., Inc.*, 288 S.W.3d at 404 (citations omitted); *Golden Spread Council, Inc. No. 562 of Boy Scouts of Am. v. Akins*, 926 S.W.2d 287, 289-90 (Tex. 1996)(whether a duty exists is a question of law for the court to decide from the particular facts of the case), *citing Greater Houston Transp. Co. v. Phillips,* 801 S.W.2d 523, 525 (Tex. 1990). In deciding whether to impose a duty, the court must weigh the risk, foreseeability, and likelihood of injury against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant. *Greater Houston Transp. Co.,* 801 S.W.2d at 525. Courts have also emphasized other factors, including

5

whether one party had superior knowledge of the risk or a right to control the actor who caused the harm. *See Graff v. Beard,* 858 S.W.2d 918, 920 (Tex. 1993).

## I.  CAUSATION

To establish proximate causation in a negligence claim, a party must prove both "cause-in-fact" and foreseeability. *See Western Investments, Inc. v. Urena,* 162 S.W.3d 547, 551 (Tex. 2005). These elements of proximate causation "cannot be established by mere conjecture, guess, or speculation." *Id., citing Doe v. Boys Clubs of Greater Dallas, Inc.,* 907 S.W.2d 472, 477 (Tex. 1995). The test for cause in fact is whether the act or omission was a substantial factor in causing the injury without which the harm would not have occurred. *See Marathon Corp. v. Pitzner,* 106 S.W.3d 724, 727 (Tex. 2003); *Nixon v. Mr. Prop. Mgmt. Co., Inc.,* 690 S.W.2d 546, 549 (Tex. 1985)(citation omitted). If the defendant's negligence merely furnished a condition that made the injuries possible, there can be no cause in fact. *See Urena,* 162 S.W.3d at 551; *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason,* 143 S.W.3d 794, 799 (Tex. 2003). Foreseeability requires that a person of ordinary intelligence should have anticipated the danger created by a negligent act or omission. *See Doe,* 907 S.W.2d at 478. The danger of injury is foreseeable if its "general character . . . might reasonably have been anticipated." *Id.*

### *Sufficiency of the Evidence*

The jury found that Parkwood's negligence proximately caused Edna's injury. Telesis contends Edna did not meet the cause-in-fact requirement of negligence and asserts that, in one instance, she also failed to establish foreseeability. In its charge, the court instructed:

> "Proximate cause" when used with respect to the conduct of Parkwood Retirement Community, means that cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred.

6

In order to be a proximate cause, the act or omission complained of must be such that an independent living facility using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

Telesis' Issues One and Two respectively complain of the legal and factual sufficiency of the evidence to satisfy the causation element of negligence. Telesis specifically challenges the causation element in the context of the emergency pull cord, the meal no-show check, and the medical evidence. It also presents a sub-complaint alleging there was "insufficient evidence satisfying the foreseeability part of the causation element" regarding the "old, inoperable bathroom cord[.]"

Telesis restricts its complaints in Issues One and Two to the causation element of Edna's negligence cause of action and does not challenge the evidence regarding the remaining elements, therefore, we accordingly restrict our analysis to the sufficiency of the evidence to support the causation element.

*Application*

### A. Emergency Call System

Telesis specifically argues that Edna failed to satisfy the causation element because she did not attempt to use the emergency call system in her apartment. Telesis also complains that there is insufficient evidence to satisfy the foreseeability component of the causation element regarding the "old, inoperable bathroom cord[.]" Several witnesses testified regarding the events related to causation.

*Edna Anderson*

7

Edna, who was approximately 99 years' old at the time of trial, did not provide live testimony. In her video-recorded deposition testimony which was played for the jury, Edna stated that as she prepared to take a shower, her knees buckled and she fell down. Edna stated that she had repeatedly tried to use the emergency call unit in her apartment but it did not work. When she was asked where the emergency unit was located, Edna stated, "By the shower." There was evidence that Edna had prior knowledge that the old emergency call unit located in the bathroom was inoperable. Edna testified that she lay on the bathroom floor for a long time after her knees buckled, and that she crawled and rolled herself to the desk where her phone was located. Edna denied that she had attempted to crawl into her bedroom. At trial, Edna's daughter, Janet, agreed that between the time of the incident and the time of the deposition, Edna's mental faculties had declined somewhat and her recollections were spotty. However, the jury also had before it other evidence.

*James Duermeyer*

Edna's son-in-law, James Duermeyer recalled that when he visited Telesis' Parkwood facility as a possible independent-living residence for Edna, among the selling points presented to him were the emergency call system that Parkwood provided to residents and the verbal representation by an employee that Parkwood would always check on a resident who did not appear for a scheduled meal to see if the resident was all right. During his visit, James observed a string attached to a switch on the bathroom wall and was informed that it was a monitored safety call system through which a resident could summon help in an emergency by pulling the cord. James considered Parkwood's safety features to be important because Edna would be living alone, and he relayed the existence of these features to his wife, Janet. One of the brochures provided to

8

James during his visit which was also displayed to the jury listed "Monitored Medical Alert" as a feature under the heading, "Safety Features." The twenty-four-hour monitored service and the promise that Parkwood would check on residents who did not attend a meal was an important selling point and influenced James' and Janet's decision to select Parkwood as Edna's residence. James testified that Parkwood did not inform him that its "missed meal" check of residents was not a safety feature of Telesis' Parkwood facility until after Edna filed her suit against Telesis. James acknowledged, however, that if a resident fell in the evening hours of a day and did not miss a meal until midday on the following day, the passing of twelve or seventeen hours is "[n]ot a way to respond to an emergency" and would not ensure anyone's safety.

James did not know that the cord in the bathroom had been rendered non-operational and was no longer a part of the emergency call system after Edna moved into her apartment. Further, he could think of no reason why Parkwood would leave the old, obsolete, dysfunctional cord in the bathroom. James later became aware that Edna had received training on a new emergency call system, and noted that Edna had the mental acuity at that time to understand what was explained to her.

James testified that it was believed that Edna had fallen at about 7 p.m. on the evening of Saturday, July 5, 2008. Edna was only able to secure assistance after telephoning Janet at 4:30 p.m. on July 6, 2008, after she had missed her midday meal. After receiving Edna's call to come to her apartment, James and Janet arrived and found Edna naked on the floor and appearing almost totally white in color. Urine and feces were all over the floor and the apartment reeked horribly. James described Edna as agitated and upset, and testified that Edna said, "If they had just come, I'd be all right. I pulled the cord three times and nobody came. . . . Parkwood let me down." James

9

acknowledged that Edna did not specify to him which cord she had pulled and, although a cord was present in the bathroom when Edna moved in, he did not know for a fact that it was present in Edna's bathroom on the day Edna called for help. Edna did inform James, however, that she had pulled the cord and had then spent the night on the floor.

James explained that Janet called Parkwood's emergency line as well as Edna's doctor, Dr. Marc Chapman, and informed Dr. Chapman that Edna had been lying on the floor in her own urine and feces for twenty-two to twenty-three hours. James used Janet's cell phone to call 9-1-1, left the apartment to wait for emergency personnel, and upon their arrival escorted them to Edna's third-floor apartment.

While the emergency medical technicians were examining Edna, James observed a man enter Edna's apartment and open a cardboard box that the man had brought with him. When James asked the man what he was doing, the man informed James that he was replacing the emergency call system because "[i]t doesn't work." The man then replaced the emergency transmitter box in Edna's bedroom. The transmitter box accepts a signal from a pendant on a lanyard. James later learned during litigation that the transmitter box which had been removed from Edna's bedroom had been discarded.

James never examined the emergency call system in Edna's apartment on or before July 6, 2008, when Edna was found in her apartment. He testified at trial that he had seen Edna's emergency call device pendant hanging from one of the two posts on her headboard. Using Edna's lanyard, James demonstrated how far down the cord on the device would dangle from the bedpost. He also acknowledged that during his pretrial deposition he could not specify how high the pendant on the lanyard was from the floor or whether it was hanging from a bedpost or

10

wrapped around the top of the bedstead. He also acknowledged that during his pretrial deposition he had stated that he would be speculating "how high from the floor the box portion of the lanyard component was" where Edna kept it on her bedpost. Although James was unaware that the emergency call pendent on the lanyard does not "snap back" on its own after it is pulled, he demonstrated that it was easy to reset the device. According to James, Edna knew and was very well aware of the newer emergency call system, and asserted that Edna had pulled the lanyard on her bed, next to which he had observed a trail of urine "tracings." He testified that Edna was mentally alert and knew what she was doing when she attempted to seek assistance.

After Edna left the hospital, James and Janet visited with Parkwood's Director, Mary Nafziger at the Parkwood facility. James testified that when he asked Mary what had happened, she stated that the emergency call system did not work. When he asked about the failure to visit Edna's room after she missed a meal, Mary stated that that system failed, too, because a new person who was working in the kitchen "just didn't get it" that he was supposed to go visit Edna. When James asked Mary what she believed Parkwood's responsibility was, she replied, "We're sorry."

James testified that prior to this incident, Edna was able to "do everything herself" including cooking her own breakfast, clothing and bathing herself, and walking a long distance to the dining room at Parkwood. After the event, James explained, Edna was unable to do any of those things and, although she could feed herself, she needed assistance with her clothing, bathing, and going to the bathroom.

At the time of trial, Edna was living in a skilled nursing facility where Janet would change Edna's soiled clothes, assist her in preparing for meals, and ensure that Edna was receiving

adequate care. James testified that Edna still says that Parkwood let her down, is very fearful of another traumatic experience, and lays in bed gripping her emergency call button in her hand. James explained that, "Janet has to go over and pry her fingers off and get that out of her hand . . . . [s]o she's very fearful that . . . another traumatic episode might occur."

*Janet Duermeyer*

Edna's daughter, Janet Duermeyer, stated that she had previously observed the emergency call device lanyard hanging from her mother's bedpost and testified that it would be accessible to anyone on the floor. Janet testified, "There was urine and feces just all over -- the bathroom was probably the worst, but then on into the bedroom and up along the bed where she would go to pull the cord [and] then out into the room and over to where the phone was." Janet also specified that she found urine along the side of Edna's bed up to the bedpost area. Although there was some evidence that Edna was taking medication for incontinence, there was no evidence that Edna had previously urinated on the floor.

Janet also testified that when she and James met with Nafziger after Edna was hospitalized, Naziger was very apologetic and commented that both of their systems had failed. Without objection, Janet testified that while she was at Edna's apartment, a Parkwood housekeeper informed her that she had known Edna's emergency call device was not working because she had noticed it several times while making Edna's bed. The housekeeper informed Janet that she had reported that Edna's emergency call unit was non-operational.

*Howard Allred and John Neill*

Howard Allred, the maintenance supervisor at Parkwood, testified that after Edna's event, he had learned from a housekeeper named Andrea that she had on four occasions reported to

12

Parkwood's management that Edna's emergency call device was not working. Allred asserted that Telesis co-owner and CEO, John Neill, had threatened to fire him if he informed anyone of the reports. John Neill was a partner and CEO of The Telesis Company, most of whose clients are elderly. Mary Nafziger reported to Neill. Neill met with Nafziger on a monthly basis, or sometimes more frequently, but stated that he was never informed by anyone that money should be expended to remove the old cords from the prior emergency call system so that its elderly residents do not become confused and pull old cords that do not work. Neill stated that he did not think he had told anyone that his or her employment would be terminated for discussing what had happened in Edna's apartment. Nor did Neill recall receiving after Edna's fall a Parkwood staff-member complaint about the system for checking on residents or anyone ever suggesting that it should not be the cooks' responsibility to check on residents who do not attend meals. When asked if it was possible that he had "shut down" an employee's recommendation that a non-slip surface be placed in slippery areas to prevent elderly persons from falling at Parkwood because it cost too much money, Neill replied, "Anything is possible."

*Mary Nafziger*

Nafziger, who initially served as Parkwood's receptionist, began serving as its Operations Manager in 2001, and became Parkwood's Director in April 2008. Nafziger was the person at Parkwood to whom everyone reported. She did not recall informing Janet and James that Edna's emergency call unit had failed. Nafziger explained that there was no real way to know if the emergency call unit was working without testing it and stated that although the base unit recovered from Edna's apartment displayed the word "operate," she did not pull the "trigger" cord to see if it was functioning but instead threw away Edna's base transmitter box unit.

13

Nafziger explained that she was the only person in charge of the emergency call units, including their programming, maintenance, and testing for proper operation, and that it was her responsibility if the units did not work. Nafziger was aware that the manufacturer's manual for the emergency call devices included a page including a heading, "Important. Please read this page," informing the reader that the emergency call units should be tested regularly. Nafziger admitted that she knew that the manufacturer's manual urged that the units be tested weekly and included a checklist on which to record the weekly testings. However, Nafziger only tested the units annually on the date of the resident's "move-in" anniversary. Nafziger explained that she was trained by a technician from Telesis' corporate office and it was her understanding that weekly testing was not necessary. Although Nafziger admitted that she may have made the decision to not test the emergency device systems weekly, she believed that the corporate office had made that decision.

She admitted knowing that the manufacturer's manual indicated that it is a foreseeable possibility that, unless the emergency call units are tested, they may not be working and agreed with that warning. Nafziger also agreed that it is foreseeable that if a unit is not tested and it is not working when someone needs to use it in an emergency, someone can be seriously injured or may die. Nafziger explained that there had been three or four instances where she discovered that units were non-functioning and the resident was unaware that his or her emergency call units were non-operational, but noted that those circumstances rarely happened. However, Nafziger also testified that on approximately six occasions she had replaced units when residents had complained about them but she did not know whether the units really worked, as it was not her

14

practice to test emergency call units about which residents had concerns but to discard and replace them with new units.

Nafziger explained that it is her understanding that if the transmitter/receiver box displays the word, "operate," she can rely on the fact that everything is working. However, when asked what would happen if the batteries were not in the lanyard but the transmitter box was plugged in, Nafziger admitted that the transmitter/receiver box "would probably still say 'operate.'"

Nafziger stated that she did not instruct Dennis Jackson, the maintenance man who initially responded to Edna's apartment that evening, to swap out the emergency call unit but rather initially told him that she was going to check the system and install a new one. She testified that Edna's emergency call system lanyard was wrapped around the middle portion of Edna's twin bed headboard and was not in a pulled position when she arrived at Edna's apartment later. Nafziger testified that she saw that the call box displayed the word "operate," and did not test the unit because she believed it was working. She proceeded to discard the emergency call box component of the emergency call system on the night Edna was found, before a corporate risk manager requested that she save the device. Nafziger explained, "[This] is what I do when I change out all of the boxes." She kept the lanyard component of the system and laid it on her desk. According to Nafziger, the corporate risk manager instructed her "two days after the fact" to save the lanyard, and Nafziger explained that she did not know why she had kept the lanyard because "it could have easily been gone by then."

When asked if she thought it was important to confirm whether the call box was working because Janet and James had said that it did not work, Nafziger said it was her opinion that it would have worked if it had been activated, and she observed that it had not been activated. She

15

explained that she threw away the box that she believed was working "[o]nly because I wanted to reassure Ms. Anderson and her family that what we would provide for her would be brand new and they could have any fears arrested." Based on what she was told by Dennis Jackson, the on-site responder, Nafziger stated that she was aware that "they felt there was a problem with [Edna's] emergency box."

Nafziger eventually admitted that Parkwood's housekeeper, Andrea, had informed her on one occasion that Edna's emergency call unit was not working, but observed that she did not recall that the notification "was real quick—short before" Edna's incident. She also explained that Parkwood has no policy for documenting incidents or injuries through the creation of reports, and none were made in this case. Nafziger shredded a sheet documenting battery changes because she did not feel she would need it. Nafziger disagreed that the emergency call system at Parkwood is a safety and security feature and disagreed that the main selling point of having an emergency call system is to aid someone who has fallen and cannot get up. She also disagreed that checking on a person who does not show up for a meal is a safety feature. According to Nafziger, residents should count on the emergency call system working, but not as a safety feature. Nafziger explained that the purpose of the emergency call system is to alert Parkwood in the event of an unforeseen accident such as an overflowing commode by permitting the resident to activate the caller and quickly receive someone at the apartment.

She acknowledged that she informs prospective new residents that the system is to be used "in case your commode is overflowing, in case you have become ill, in case you have fallen." When asked about the promotional brochure Parkwood provided to James, Nafziger explained that the "Safety Features, Monitored Medical Alert" referenced in the brochure indicated a medical

16

device like a bracelet that is "monitored by an outside company . . . [t]hat's not something that we do," and stated that she was not aware that Parkwood provides that type of service. Instead, Nafziger explained she informs people that "we provide them with an emergency caller" and does not tell them that they should rely on it for safety. Nafziger said she instructed residents to wear the lanyard or place it where they would be able to reach it in the event they fall and are laying on the floor.

### B. Missed-Meal Checks

Telesis also argues that there is insufficient evidence of negligence concerning its practice of checking on residents who fail to attend scheduled meals, which it argues was provided as a courtesy and notes is not included within the occupancy agreement that Edna signed. Although this practice had been satisfactorily implemented on a prior occasion when Edna had overslept, it was not implemented on July 6, 2008, when Edna failed to attend her meal.

Parkwood employee Reginald Austin testified that he had worked at Parkwood for fourteen years and explained that Telesis' Parkwood facility routinely monitored residents' attendance at meals. Absent a resident's advance notification that he or she would not be attending a meal, a Telesis employee would check on an absent resident's welfare. Austin explained that a phone call would first be placed to the resident's apartment and, if the resident did not answer the telephone, someone would go to the resident's apartment to check on the resident and ensure "everything [was] okay." Austin testified that he was not on duty on the day Edna missed her meal, and explained that the kitchen manager who was on duty that day had failed to check on Edna.

17

Austin also testified regarding a previous occasion when a Parkwood resident who had fallen in her apartment was taken to the hospital. When the resident did not appear for a meal, the staff assumed that the resident was still in the hospital, and no one followed the procedure of checking on the resident. In fact, the resident had returned to her apartment that same evening, had slipped and fallen, and had died.

When asked if she took any responsibility for the event involving Edna, Nafziger replied that she was sorry it happened and she took responsibility for the fact that "we didn't close the loop with checking on her after lunch." She testified that when she met with James and Janet, she informed them "that if we had not checked on Ms. Anderson as we should, I was very sorry that that system failed and that I would certainly check into why [our practice] had not been followed[.]" Nafziger agreed that it was reasonable for the residents to rely on the fact that in the event they miss a meal, they will be checked on before more than one day passes, that a reasonable and prudent facility would ensure such residents were checked on, and that the failure of Parkwood's cook to check on Edna after she missed a meal was negligence. She also conceded that it was foreseeable that failing to check on someone who had fallen could lead to great harm and even death.

### C. Causation

Telesis also complains that the medical evidence fails to show causation because Dr. Chapman was unable to testify to a reasonable degree of medical probability how long Edna had been on the floor before suffering permanent muscle damage, and provided only a range of hours between four and eight to twelve hours in which rhabdomyolysis could commence.

18

Allred testified that prior to the incident, Edna "was really in good condition for her age," was not in a wheelchair, was able to walk and cooked, would engage in activities with other residents, and whatever health problems she may have had, they were "not anything that kind of restricted her[.]" Janet described the incident as a turning point in her mother's health, before which Edna lived independently, walked, cooked, could clothe and bathe herself, was happy, and enjoyed life. Dr. Chapman, who was Edna's personal physician, testified that Edna was in good health generally, had some arthritis in her knees, which had improved in some regards, was independent, did not need much assistance, and had limited complaints.

Dr. Chapman learned from Edna that she had collapsed and remained on the floor for more than 20 hours before being found, and confirmed this information from the history Edna had provided to the emergency room physician. He determined that Edna did not suffer any serious injuries such as fracture, head injury, stroke, or a cardiac event when she "fell," and determined that she may have experienced fatigue or weakness rather than a fall.

From laboratory tests, Dr. Chapman determined that Edna had suffered from rhabdomyolysis, a deterioration or necrosis of the muscles that can be caused by trauma to the muscles, such as lying on the floor or being in an immobile state. After ruling out other causes, Dr. Chapman concluded that the length of time Edna spent on the floor and her inability to move well during that time was, within a reasonable degree of medical probability, the most likely cause of Edna's rhabdomyolysis.

Although Dr. Chapman testified he could not predict how early Edna would have experienced the effects of rhabdomyolysis, he explained that the muscle damage Edna experienced could have been prevented or reduced if someone had attended to Edna earlier because the extent

19

of the damage from rhabdomyolysis correlates with the amount of time the muscle is experiencing the damage under circumstances such as Edna's. He explained that, "[T]he issue . . . is just the total time you're down . . . [because] you're just going to get weaker the longer you're down." While there may be some acceleration of damage in the last few hours, Dr. Chapman observed that the quantification of that time period would be different for every person. Dr. Chapman acknowledged that he could not to a reasonable degree of medical probability state how long Edna had to be on the floor before suffering permanent muscle damage but noted that he could state within a reasonable degree of medical probability that the longer someone like Edna is on the floor, the worse the rhabdomyolysis will become and given Edna's very high level of myoglobin, testified that he could state with certainty that Edna suffered more damage with each hour that passed. He also explained that if Edna had been found on the evening of her fall, it would have been much less likely that Edna would have suffered permanent muscle damage as she did, and specified that if Edna had been found after four hours, she would not have suffered as much damage as was present at twenty-four hours.

According to Dr. Chapman, nothing other than the rhabdomyolysis prevented Edna from returning to her pre-event condition. Myoglobin, the enzyme that is released during rhabdomyolysis is also a cardiac enzyme for which the emergency room physicians tested Edna. Dr. Chapman explained the myoglobin value can be used to quantitate to some degree the amount of a person's injury and noted that in a mild case, as when a person has muscle pain from exercising excessively or due to medication, such levels will be between 300 and 400 ng/ml and, even then, steps will be taken to stop the ongoing damage because damage over time is the most concerning factor. Dr. Chapman testified that Edna's myoglobin measured "dramatically high,"

20

at more than 10,000 ng/ml, a level "[w]e would call . . . a severe increase in the myoglobin." A normal level of myoglobin is 40 ng/ml. Regarding these myoglobin levels, Dr. Chapman explained, "The higher the number, the more the injury . . . [and] the worse the outcomes."

Dr. Chapman stated that although Edna did not suffer acute kidney injury or cardiac injury and experienced mild elevation of liver enzymes, she suffered permanent muscle damage. He explained that Edna's prolonged time on the floor was the beginning of a "downhill course" for her.

Edna Anderson presented evidence that Parkwood's act or omission was a substantial factor in causing the injury, permanent muscle damage, without which the harm to her would not have occurred, and presented evidence that a person of ordinary intelligence should have anticipated the foreseeable danger of injury created by the negligent act or omission because its general character might have been reasonably anticipated. *See Marathon Corp.,* 106 S.W.3d at 727; *Doe,* 907 S.W.2d at 478.

We have reviewed the entire record, credited favorable evidence if reasonable jurors could, disregarded contrary evidence unless reasonable jurors could not, and conclude that more than a scintilla of evidence exists to support the jury's findings regarding Parkwood's negligent causation of Edna's harm. *City of Keller*, 168 S.W.3d at 827. Having considered all of the evidence, we further conclude the judgment is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). Because the evidence is legally and factually sufficient to support the jury's findings as to causation, Issues One and Two are overruled.

## II. NEGLIGENT UNDERTAKING

21

## A. Broad Form Question

Telesis next broadly complains that "Plaintiff failed to request and the judge failed to submit a jury question concerning, and there was not sufficient proof of, the elements of a negligent undertaking." In Issues Three, Four, and Five, Telesis complains respectively that: (1) the trial court erred in submitting a broad form negligence jury question instead of a negligent undertaking instruction and question; (2) there was no evidence to support a negligent undertaking claim against Telesis; and (3) there was factually insufficient evidence to support a negligent undertaking claim against Telesis.

After Telesis had objected to portions of the trial court's proposed charge, it tendered to the trial court the following granulated Question 1, which the court refused:

> Did the negligence, if any, of Parkwood Retirement Community proximately cause the injury in question?
>
> Parkwood Retirement Community was negligent if-
>
> > 1. Parkwood Retirement Community undertook to perform services that it knew or should have known were necessary for Edna Anderson's protection, and
> > 2. Parkwood Retirement Community failed to exercise reasonable care in performing those services, and
> > 3. [E]ither Edna Anderson relied on Parkwood Retirement Community's performance or Parkwood Retirement Community's performance increased Edna Anderson's risk of harm.
>
> > Answer "Yes" or "No": ___

Telesis then objected to Question 1 of the trial court's proposed charge on the basis that there was "no evidence regarding a duty on behalf of Parkwood Retirement Community that was breached." The trial court overruled that objection and submitted in its charge Question 1 which

22

asked, "Did the negligence, if any, of Parkwood Retirement Community proximately cause the injury in question?"

On appeal, Telesis presents specific broad-form instruction complaints not expressly presented to the trial court. Edna initially counters that Telesis failed to preserve its broad form jury question complaint for our consideration because its objection fails to explain why the broad form question was not appropriate and fails to identify the legal basis Telesis now asserts on appeal.

## 1. Preservation

We first consider whether Telesis has preserved for appellate review its complaint regarding the broad form of Question 1, and we conclude that it has preserved the complaint.

Rule 274 requires that a party objecting to a charge point out distinctly the objectionable matter and the grounds of the objection. TEX. R. CIV. P. 274. Any complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections. *Id.* The purpose of this rule is to afford the trial court an opportunity to correct charge errors by requiring an objecting party to clearly designate the error and explain the grounds for its complaint. *See Burbage v. Burbage*, 447 S.W.3d 249, 256 (Tex. 2014)(citations omitted).

The Texas Supreme Court has reiterated that the procedural requirements for determining whether a party has preserved error in the jury charge are explained by one basic test: "whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling." *See Thota*, 366 S.W.3d at 689, *quoting State Dep't of Highways v. Payne,* 838 S.W.2d 235, 241 (Tex. 1992). Additionally, to preserve error for appellate review, the rules generally require the

23

complaining party to make a timely objection to the trial court stating the grounds for the ruling that the complaining party seeks with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context, and obtain a ruling. TEX. R. APP. P. 33.1.

In resolving this preservation issue, we are guided by the Texas Supreme Court's consideration of a similar complaint in *Thota*. *Thota*, 366 S.W.3d at 691. There, the Court considered whether a complaint regarding a broad-form question as to an element of damages was preserved. *Id.* Following its ruling in *Harris Cnty. v. Smith,* 96 S.W.3d 230, 236 (Tex. 2002), in which the Court had determined that "[a] timely objection, plainly informing the court that a specific element of damages should not be included in a broad-form question because there is no evidence to support its submission, therefore preserve[d] the error for appellate review[,]" the *Thota* Court ruled that a party's objection to a submitted charge along with its submission and presentation of a proposed charge to the trial court according to its theory of the case was sufficient to place the trial court on notice that the party believes the evidence does not support the challenged instruction. *Thota*, 366 S.W.3d at 691. The Court noted that it has long favored a common sense application of its procedural rules that serves the purpose of the rules, rather than a technical application that rigidly promotes form over substance. *Thota*, 366 S.W.3d at 690.

Telesis requested a granulated Question 1 and objected to the trial court's broad form Question 1 in immediate succession, without the interposing of other objections or requests by any party. From the context of Telesis' requested Question 1 and its immediate, subsequent objection to the trial court's proposed Question 1, we conclude the specific grounds of Telesis' objection, which included seeking a granulated question rather than a broad form question, were apparent to

24

the trial court. Therefore, Telesis has preserved for our consideration its objection to the trial court's broad form question.

## 2. Proper Form of Jury Question

Telesis contends that Edna's claims "plainly would be characterized as claims for negligent undertakings," and complains that Edna failed to request, and the trial court failed to submit, a jury instruction on negligent undertaking. *See Torrington Co. v. Stutzman,* 46 S.W.3d 829, 838-39 (Tex. 2000). To establish a negligent undertaking, a plaintiff must show that the defendant undertook to perform services that it knew or should have known were necessary for the plaintiff's protection, that the defendant failed to exercise reasonable care in performing those services, and either that the plaintiff relied upon the defendant's performance, or that the defendant's performance increased the plaintiff's risk of harm. *Nall v. Plunkett*, 404 S.W.3d 552, 554-56 (Tex. 2013); *see also Dukes v. Philip Johnson/Alan Ritchie Architects, P.C.,* 252 S.W.3d 586, 598 (Tex.App. –Fort Worth 2008, pet. denied), *citing Torrington Co.,* 46 S.W.3d at 839. The broad-form submission for a typical negligence claim and a negligent-undertaking claim is the same, except that an undertaking claim requires the trial court to instruct the jury that a defendant is negligent only if the defendant undertook to perform services that it knew or should have known were necessary for the plaintiff's protection, the defendant failed to exercise reasonable care in performing those services, and either the plaintiff relied upon the defendant's performance, or the defendant's performance increased the plaintiff's risk of harm. *Nall*, 404 S.W.3d at 555-56, *citing Torrington,* 46 S.W.3d at 838–39; Restatement (Second) of Torts § 324A (providing the rule for liability arising from negligent performance of an undertaking).

After the trial court ruled on Telesis' motion for directed verdict, Edna's causes of action for negligence, gross negligence and malice, and breaches of warranty remained. Our review of the pleadings, record, evidence, and arguments reveals at no time did Edna plead, try, or argue a negligence cause of action against Telesis based on negligent undertaking. Rather, our review of the record indicates that Edna presented a negligence cause of action based upon one or more duties arising from an ordinary duty of care. Indeed, in conformity with Edna's pleadings and the evidence admitted at trial, the trial court instructed the jury in the court's charge:

> "Negligence," when used with respect to the conduct of Parkwood Retirement Community, means failure to use ordinary care, that is, failing to do that which an independent living facility of ordinary prudence would have done under the same or similar circumstances or doing that which an independent living facility of ordinary prudence would not have done under the same or similar circumstances.

> "Ordinary Care," when used with respect to the conduct of Parkwood Retirement Community, means that degree of care that would be used by an independent living facility of ordinary prudence under the same or similar circumstances.

> "Proximate cause" when used with respect to the conduct of Parkwood Retirement Community, means that cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that an independent living facility using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

For these reasons, we conclude the trial court did not abuse its discretion in refusing to submit a negligent undertaking instruction. *Thota*, 366 S.W.3d at 687, *citing In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000). Issue Three is overruled.

### B. Evidence of Negligent Undertaking

26

In Issue Four, Telesis asserts that there was no evidence of the necessary elements of a negligent undertaking claim, and in Issue Five contends it is entitled to a new trial because any negligent undertaking claim was against the overwhelming weight of the evidence or against the great weight and preponderance of the evidence. As we have determined Edna's negligence theory was not based upon negligent undertaking but rather upon the existence of a duty of ordinary care, thus, she was not required to prove the elements of negligent undertaking. Issues Four and Five are overruled.

## III. COMPENSATORY DAMAGES

In Issues Six, Seven, Eight, Nine, and Ten, Telesis challenges the sufficiency of the evidence to support the jury's award of compensatory damages.

*Standard of Review*

We review a challenge to the propriety of a damages award for factual sufficiency of the evidence. *See Lofton v. Texas Brine Corp.,* 720 S.W.2d 804, 805 (Tex. 1986). When conducting a factual sufficiency review, we must consider and weigh all of the evidence, both in support of and against the findings, in order to decide whether the verdict should be set aside. *Doctor v. Pardue,* 186 S.W.3d 4, 17 (Tex.App. –Houston [1st Dist.] 2006, pet. denied), *citing Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex. 1986); *see Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex. 1996); *Lofton,* 720 S.W.2d at 805. We reverse and remand for a new trial only if the verdict is so against the great weight and preponderance of the evidence that it is manifestly unjust or shocking to the conscience. *Golden Eagle Archery, Inc. v. Jackson,* 116 S.W.3d 757, 761 (Tex. 2003); *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex. 1986); *Pool,* 715 S.W.2d at 635.

27

In conducting our review, we must bear in mind that the jury is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *Golden Eagle Archery,* 116 S.W.3d at 761; *Jones v. Tarrant Util. Co.,* 638 S.W.2d 862, 866 (Tex. 1982). As this court is not a fact finder, we may not substitute our judgment for that of the jury, even if the evidence would clearly support a different result. *Pool,* 715 S.W.2d at 634. Further, as fact finder, the jury is free to believe one witness and disbelieve another. *McGalliard v. Kuhlmann,* 722 S.W.2d 694, 697 (Tex. 1986). The jury also resolves any inconsistencies in any witness's testimony. *Id*. Where the award is based on non-empirical damages such as mental anguish and pain and suffering, the court will generally leave that determination to the discretion of the jury. *See Dico Tire, Inc. v. Cisneros,* 953 S.W.2d 776, 791–92 (Tex.App. –Corpus Christi 1997, pet. denied).

Where, as here, someone suffers personal injuries, the damages fall within two broad categories: economic and non-economic damages. *Golden Eagle Archery,* 116 S.W.3d at 763. Texas recognizes the following categories of non-economic damages: pain, suffering, mental anguish, disfigurement, and physical impairment. *Id.* at 769. These categories of non-economic damages may overlap. *Id.* at 770.

Generally, our starting point for conducting a factual sufficiency review is the charge and instructions to the jury. *Id*. at 762. In the instant case, Question 2 asked the jury to fill in five blanks: (1) past physical pain and mental anguish; (2) future physical pain and mental anguish; (3) past physical impairment; (4) future physical impairment; and (5) past medical expenses.

The jury was instructed:

Consider the elements of damages listed below and none other. Consider each element separately. Do not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any. Do not include interest on any amount of damages you find.

Do not include any amount for any condition not resulting from the injury in question.

Answer separately, in dollars and cents, for damages, if any. Do not reduce the amounts, if any, in your answers because of the negligence, if any, of Edna Anderson.

Unless the record demonstrates otherwise, we must presume the jury followed the instructions given. *Id.* at 771.

*Analysis*

In Issues Six and Seven respectively, Telesis argues we should set aside the compensatory damages award and remand for a new trial because the evidence is legally and factually insufficient to support the jury's finding of negligence. Telesis specifically argues, "If the cause-in-fact and foreseeability elements of causation are missing for Question 1, . . . then no compensatory damages can stand." In Issues One and Two, we determined the evidence of causation is legally and factually sufficient to support the jury's finding that Telesis was negligent. Therefore, Issues Six and Seven are overruled.

In Issue Eight, Telesis complains the evidence was legally and factually insufficient to allow the jury to allocate Edna's damages between those indisputably not caused by Telesis and those claimed to have been caused by Telesis. Telesis first raised its legal sufficiency challenge regarding allocation of damages in its post-trial amended motion for judgment notwithstanding the

29

verdict and again in its motion for new trial, which the trial court denied.[2]  To preserve a factual sufficiency challenge, a party must raise the issue in a motion for new trial.  TEX. R. CIV. P. 324(b)(2); *Cecil v. Smith*, 804 S.W.2d 509, 510 (Tex. 1991).  In its motion for new trial, Telesis broadly complained that "there was insufficient evidence admitted that would allow the jury to allocate damages," "the sums determined were for the entire injury," and provided "no basis for fashioning a proper judgment in any amount."

As in its post-trial motions, Telesis' brief neither cites any legal authority nor provides any discussion of law in support of its complaints regarding the allocation of damages and the evidence necessary to support an award of damages.[3]  TEX. R. APP. P. 38.1(i)(brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record).  According to Telesis, the jury awarded the entirety of the medical expenses and other compensatory damages "against" Telesis, and complains that the stipulated medical expense consisted of all harm and injury between Edna's fall and her attempt to summon aid and from the fall to lunchtime on July 6, 2008.

Telesis does not direct us to any evidence demonstrating that any damages found by the jury relate back to Edna's unexplained collapse rather than to Telesis' sole negligence, but instead contends the proof did not allow the jury to logically and properly allocate between damages attributable to Edna's fall and incremental damages thereafter occurring when the meal "no-show" check failed.  Asserting that there is no evidence of the time when Edna pulled the emergency call

---

[2] Telesis lodged no objections or arguments at trial regarding allocation of compensatory damages, nor requested the trial court to instruct the jury regarding allocation of compensatory damages during trial.

[3] The issues initially identified in the "Issues Presented" portion of Telesis' brief do not strictly align with the arguments later presented.  Indeed, it may be said that the issues presented are multifarious, but we address those issues we have reasonably discerned from the arguments.

system cord, Telesis contends the "injury in question" set out in the trial court's charge "became the full injury from the incident" rather than any injury resulting from Edna's prolonged stay on the floor as caused by Telesis' negligence. We note that Telesis did not present these exact arguments to the trial court in its motion for new trial.

In its charge, the trial court instructed the jury to base its answers only on the evidence admitted in court and on the law contained in the instructions and questions set out within the charge. The charge also instructed the jury to answer each question about damages separately, prohibited the jury from increasing or reducing the amount of damages in one answer because of its answer to another question about damages, and instructed the jury to refrain from considering, discussing, or speculating regarding other matters specified in the charge.

Question 1 asked the jury to determine whether Telesis' negligence proximately caused the injury in question. In Question 2, the trial court's instruction directed that the jury neither include any amount of damages for any condition not resulting from the injury in question nor reduce the amount of its answers to the damages questions because of Edna's negligence, if any. The damages at issue in Questions 1 and 2 were those proximately resulting from Telesis' negligence. Whether damages were proximately caused by Telesis' breach of a duty was an element of Edna's negligence claim, which the jury affirmatively determined in its answer to Question 1. *See Nabors Drilling, U.S.A., Inc.*, 288 S.W.3d at 404. The determination of the amount of such damages as set out within Question 2 was within the province of the jury. *See Gibbins v. Berlin*, 162 S.W.3d 335, 343-44 (Tex.App. –Fort Worth 2005, no pet.)(amount to be awarded for pain and suffering damages best left to province of jury).

31

We find no evidence in the record that the jury failed to follow the trial court's instructions, and Telesis has failed to direct us to any. Unless the record demonstrates otherwise, and it does not, we must presume that the jury followed the trial court's instructions. *See, e.g., Golden Eagle Archery, Inc.,* 116 S.W.3d at 771; *Tesfa v. Stewart,* 135 S.W.3d 272, 279 (Tex.App. –Fort Worth 2004, pet. denied). Moreover, Telesis' failure to cite to any law or legal authority in support of its allocation complaints fails to persuade us that its allocation arguments are meritorious. Issue Eight is overruled.

In Issues Nine and Ten respectively, Telesis again challenges the legal and factual sufficiency of the evidence to support the jury's compensatory damage awards. Telesis generally contends that the "compensatory damage award is unsupportable because of the lack of proof linking any quantifiable negative change concerning [Edna] on or after July 5-6, 2008, in any way to the events of those two days," and asserts that the record is devoid of proof justifying the jury's award in the five categories of damages. We address each component separately.

*Past and Future Pain and Mental Anguish*

Question 2 of the trial court's charge asked what sum of money would fairly and reasonably compensate Edna for her damages, if any, resulting from the injury in question. For physical pain and mental anguish sustained in the past, the jury's answer was $150,000. For Edna's future physical pain and mental anguish, the jury awarded Edna $36,000.

Even where a defendant's conduct is merely negligent, "Texas has authorized recovery of mental anguish damages in virtually all personal injury actions." *City of Tyler v. Likes*, 962 S.W.2d 489, 495 (Tex. 1997), *quoting Krishnan v. Sepulveda,* 916 S.W.2d 478, 481 (Tex. 1995). However, in *Parkway Co. v. Woodruff,* 901 S.W.2d 434, 444 (Tex. 1995)(citations omitted), the

32

Texas Supreme Court held that mental anguish damages cannot be awarded without either direct evidence of the nature, duration, or severity of plaintiff's anguish, thus establishing a substantial disruption in the plaintiffs' daily routine, or other evidence of a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger. *See also Hancock v. Variyam*, 400 S.W.3d 59, 68 (Tex. 2013).

We apply a traditional no-evidence standard to a mental anguish finding to determine whether the record reveals any evidence of a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger. *Parkway Co.,* 901 S.W.2d at 444. To support an award for future mental anguish, a party is required to demonstrate a reasonable probability that she will suffer compensable mental anguish in the future. *Adams v. YMCA of San Antonio*, 265 S.W.3d 915, 916-17 (Tex. 2008). In reviewing the jury's finding, we consider whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *City of Keller,* 168 S.W.3d at 822, 827. We consider all of the evidence in the light most favorable to the verdict, and indulge every reasonable inference that would support it. *Id.* at 822.

It is well-settled that there must be both evidence of the existence of compensable mental anguish and evidence to justify the amount awarded. *See Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 231 (Tex. 2011); *Bentley v. Bunton*, 94 S.W.3d 561, 606 (Tex. 2002), *quoting Saenz v. Fidelity & Guar. Ins. Underwriters,* 925 S.W.2d 607, 614 (Tex. 1996). Mental anguish damages cannot be determined with mathematical precision but only through the exercise of sound

33

judgment. *Bentley v. Bunton,* 94 S.W.3d 561, 605 (Tex. 2002). The Fort Worth Court of Appeals has explained:

> The process of awarding damages for amorphous, discretionary injuries such as mental anguish or pain and suffering is inherently difficult because the alleged injury is a subjective, unliquidated, nonpecuniary loss. The presence or absence of pain, either physical or mental, is an inherently subjective question. No objective measures exist for analyzing pain and suffering damages. Once the existence of some pain and suffering has been established, however, there is no objective way to measure the adequacy of the amount awarded as compensation.

*HCRA of Texas, Inc. v. Johnston*, 178 S.W.3d 861, 871 (Tex.App. –Fort Worth 2005, no pet.). A great deal of discretion is given to the jury in awarding an amount of damages it deems appropriate for pain and suffering. *Id*. While the impossibility of any exact evaluation of mental anguish requires that a jury be given a measure of discretion in finding damages, that discretion is limited and the jury must find an amount that, in the standard language of the jury charge, "would fairly and reasonably compensate" for the loss. *Saenz,* 925 S.W.2d at 614 (citations omitted). An award of mental anguish damages will survive a legal sufficiency challenge when the plaintiff has introduced direct evidence of the nature, duration, and severity of her mental anguish, thus establishing that there was a substantial disruption in her daily routine. *Parkway Co.,* 901 S.W.2d at 444; *O'Dell v. Wright*, 320 S.W.3d 505, 514 (Tex.App. –Fort Worth 2010, pet. denied).

Evidence of past pain and mental anguish may be proven through a plaintiff's testimony or other evidence, including circumstantial evidence. *See Providence Health Ctr. v. Dowell*, 167 S.W.3d 48, 59 (Tex.App. –Waco 2005), *rev'd on other grounds*, 262 S.W.3d 324 (Tex. 2008). In the absence of direct evidence of pain, the jury is permitted to infer the occurrence of pain from the nature of the injury. *Escoto v. Estate of Ambriz*, 200 S.W.3d 716, 730 (Tex.App. –Corpus Christi 2006), *rev'd on other grounds sub nom. Nabors Drilling*, *U.S.A., Inc. v. Escoto*, 288 S.W.3d 401

34

(Tex. 2009); *HCRA of Texas, Inc.*, 178 S.W.3d at 871 (existence of conscious pain and suffering may be established by circumstantial evidence; pain and suffering may be inferred or presumed as a consequence of severe injuries). The duration of the pain and mental anguish is an important consideration for the fact finder. *HCRA of Texas, Inc.*, 178 S.W.3d at 871.

A plaintiff who proves some physical injury may recover damages for past mental anguish. *Parkway Co.*, 901 S.W.2d at 444. Texas permits recovery of mental anguish damages in virtually all personal injury actions, even where the defendant's conduct was merely negligent. *City of Tyler*, 962 S.W.2d at 495; *Krishnan v. Sepulveda,* 916 S.W.2d 478, 481 (Tex. 1995). When serious bodily injury is inflicted, physical and mental suffering may be inferred. *Likes*, 962 S.W.2d at 495; *see also Kennedy v. Missouri Pac. R.R.,* 778 S.W.2d 552, 557 (Tex.App. – Beaumont 1989, writ denied).

As long as sufficient probative evidence exists to support the jury's verdict, neither the reviewing court nor the trial court is entitled to substitute its judgment for that of the jury. *HCRA of Texas, Inc.*, 178 S.W.3d at 871. On appeal, we will set aside the verdict only where the record clearly indicates that the award was based on passion, prejudice, or improper motive, or is so excessive as to shock the conscience. *Id*. at 871-72.

Telesis asserts there is no basis for the jury's awards, notes that Edna only testified by deposition despite the fact that she was present at trial, and argues that nothing in the admitted evidence mentions that Edna experienced any pain or mental anguish. Telesis also notes that Edna informed Dr. Chapman that she had no pain, and that no witness established that Edna would experience future pain. It attributes testimony that Edna is not as outgoing as she was before the incident to Edna's hearing problems. Telesis attributes Edna's fears to her age and prior injuries,

35

and contends without evidentiary support that "Few 99-year-olds are free of fear or impervious to loneliness." It next directs us to evidence that at the time of trial, Edna was "very alert inwardly," read daily newspapers, and played cards and bingo, and at the time of her pretrial deposition, she was not taking medications regularly and could not remember what she was thinking between the time of her collapse and getting to the telephone. Finally, Telesis notes Edna's past medical history, specifically that she was at one time treated for anxiety and depression for which she was prescribed medication. Dr. Chapman's testimony revealed that Edna was seen in approximately 2004 for lethargy, was determined to be nervous about upcoming travel and experiencing mild chronic depression, and was prescribed a "very low dose" anti-depressant. All subsequent examinations indicated Edna was "doing well from the depression standpoint." For these reasons, Telesis contends there was no proof of past mental anguish. We disagree.

After Janet arrived at the apartment, Edna informed Janet that she could not get up and had dragged herself. Janet then observed "burns on her arm, like rug burns, and on the side of her knees and on the side of her ankles." The medical records admitted into evidence show that Edna reported experiencing little, if any, pain during her emergency and hospital care, and was advised upon discharge from the hospital to take Tylenol as needed for pain.[4] Dr. Chapman did not speak with Edna until the morning of July 7, 2008, after she had been discovered, transported to the hospital, and treated in the emergency room and hospital. He testified that Edna did not complain of pain but stated that rhabdomyolysis can be painful. Dr. Chapman also testified that Edna suffered permanent muscle damage and weakness, stated that had Edna not received

---

[4] There is only one medical record in evidence noting that Edna reported her pain level as registering 1 out of 10. All other medical records indicate Edna reported no pain.

36

intravenous fluids, she could have suffered kidney failure or liver damage, and explained that because the emergency room personnel quickly recognized Edna's condition and commenced treatment, Edna was out of mortal danger within twenty-four hours. When asked whether she had observed Edna to be in pain because of what happened at Parkwood, Janet testified that she has observed her mother moan or move upon attempting "to move or transfer from the bed to the wheelchair or something."

The jury also had before it some evidence regarding Edna's past and future mental anguish. Janet described Edna as sounding "hysterical" when she telephoned for help, and said, "Can you come? I need help. I haven't had any food or water for a long time. Help. Come." After Janet's arrival, Edna stated, "I'm so weak," and Janet described Edna as being excited, angry, and frustrated. Edna complained, "They didn't come. I tried three different times to call – to get them." James described Edna as being agitated and very upset at her apartment, where she complained, "If they had just come, I'd be all right. I pulled the cord three times and nobody came. . . . Parkwood let me down." Janet explained that her mother was a fastidious person and observed urine and feces "just all over[.]" At trial, James testified that after the incident, Edna remained nervous or worried about emergencies, and specified:

> She still to this day . . . is very fearful of something again happening, another traumatic experience. She lays in her bed at the nursing home with her emergency call button in her hand gripping it. Janet has to go over and pry her fingers off and get that out of her hand, get her up, get her out of bed and into lunch and dinner and what have you. So she's very fearful that something--another traumatic episode might occur.

Janet acknowledged observing immediate changes in Edna's demeanor after the incident, and explained her mother's fear of being alone:

37

She's been and to this day is very fearful of being by herself. Even when I'm in the room and she's in her wheelchair, which would be a very safe situation, she always [asks] . . . for the call button in her room. It's right beside her bed. And I'll say, "You don't need that."

Although the direct evidence of any pain Edna suffered may be deemed scarce, and the medical records and Dr. Chapman noted that Edna did not report any pain, the jury had before it evidence that Edna had dragged herself through the apartment as she attempted to summon help and suffered rug burns, was struck in the shoulder by the telephone as she attempted to retrieve it and call for help after being without food and water, was hysterical when she spoke with Janet by phone, displayed anger, frustration, and excitement upon being found by Janet and James, and after the incident and through trial, was fearful of being without her emergency call button. At a minimum, Edna's fear of being without an emergency call button constitutes some direct evidence of the nature, duration, and severity of Edna's mental anguish evidencing "'a high degree of mental pain and distress' that is 'more than mere worry, anxiety, vexation, embarrassment, or anger.'" *Parkway Co.,* 901 S.W.2d at 444. Indeed, that Edna's fingers must be pried off of the emergency button while she is in bed arguably constitutes some physical manifestation and evidence of Edna's mental anguish which continued through the time of trial.

Telesis' complaint as to damages for future physical pain and suffering is restricted to, "Dr. Chapman's statement that [Edna] told him she had no pain[,]" and "[t]here was no . . . factual basis for projecting mental anguish into the future." In support of these contentions, Telesis relies on *Adams v. YMCA of San Antonio*, 265 S.W.3d 915, 917 (Tex. 2008), which provides that a party must demonstrate a reasonable probability that she will suffer compensable mental anguish in the future to support an award for future mental anguish. However, a personal injury, as in this case, may provide an adequate basis to permit a jury to reasonably conclude that a plaintiff will continue

38

to suffer substantial disruptions in her daily routine of the kind that the evidence has shown the plaintiff has suffered in the past, and will support an award of damages for future mental anguish. *See Fifth Club, Inc. v. Ramirez*, 196 S.W.3d 788, 797-98 (Tex. 2006); *cf Parkway Co.*, 901 S.W.2d at 442 (setting out the type of proof necessary to establish mental anguish in non-personal injury case).

We conclude that sufficient probative evidence exists to support the jury's physical pain and mental anguish awards, as a category of damages, and that the awards were not based on passion, prejudice, or improper motive, nor are so excessive as to shock the conscience. *HCRA of Texas, Inc.*, 178 S.W.3d at 871-72. We also conclude that the jury's determination that Edna will continue to suffer physical pain and mental anguish of the type she has suffered in the past is a reasonable one, and that the evidence supports, as a category of damages, the jury's award of future physical pain and mental anguish damages.

After reviewing all the evidence, we conclude the evidence is legally sufficient to support the jury's finding of and awards of damages for past and future physical pain and mental anguish. Similarly, bearing in mind that we must not substitute our judgment for that of the fact finder, we cannot say that the evidence supporting the jury's finding of and awards for past and future physical pain and mental anguish damages is so weak or so contrary to the overwhelming weight of all the evidence as would lead us to conclude that the jury's determinations are wrong.

*Physical Impairment*

The jury awarded Edna $300,000 for past physical impairment and $15,000 for physical impairment that Edna would reasonably sustain in the future. Telesis complains that these sums are not supported by legally and factually sufficient proof.

39

Physical impairment, which is sometimes called loss of enjoyment of life, encompasses the loss of the injured plaintiff's former lifestyle. *See Schindler Elevator Corp. v. Anderson*, 78 S.W.3d 392, 412 (Tex.App. –Houston [14th Dist.] 2001, pet. granted, judgment vacated w.r.m.), *disapproved on other grounds by Roberts v. Williamson,* 111 S.W.3d 113 (Tex. 2003); *Wal–Mart Stores, Inc. v. Holland,* 956 S.W.2d 590, 599 (Tex.App.—Tyler 1997), *rev'd on other grounds,* 1 S.W.3d 91 (Tex. 1999)(per curiam). "To receive damages for physical impairment, the injured party must prove that the effect of his physical impairment extends beyond any impediment to his earning capacity and beyond any pain and suffering to the extent that it produces a separate and distinct loss that is substantial and for which he should be compensated." *Schindler Elevator Corp.*, 78 S.W.3d at 412; *Peter v. Ogden Ground Serv., Inc.,* 915 S.W.2d 648, 650 (Tex.App.—Houston [14th Dist.] 1996, no writ). A plaintiff must produce some evidence showing the tasks or activities she is unable to perform, unless the separate and distinct loss is obvious. *Estrada v. Dillon*, 44 S.W.3d 558, 561 (Tex. 2001)(evidence of physical impairment must focus on restriction of activities caused by the injury). However, a plaintiff need not prove an inability to perform an act that she was previously able to perform. *Dodge v. Watts*, 876 S.W.2d 542, 543-44 (Tex.App. – Amarillo 1994, no writ). Nor must a plaintiff prove egregious injuries to recover physical-impairment damages. *Rosenboom Mach. & Tool, Inc. v. Machala*, 995 S.W.2d 817, 824 (Tex.App. –Houston [1st Dist.] 1999, pet. denied).

Prior to the event in her apartment, Edna had been living in a completely independent manner, was very outgoing and lively, walked within her apartment without a walker, and would use a rolling walker outside of her apartment to walk "quite a distance" to the dining hall and central activities area where she would play cards, bingo, and dominoes with her friends in the

40

afternoon, making trips back and forth daily, and could still do the things she enjoyed. Edna was happy and enjoyed the people and her neighbors at Parkwood. Janet explained that Edna liked to play cards and dominoes with her friends, go to the library, and would sometimes attend church services at Parkwood. Edna would eat dinner in her apartment, and bathe herself before watching television and going to bed. Although Edna was at that time experiencing progressive hearing loss and arthritic knees, she had no special needs or special risks that existed before July 2008. Janet testified that at the time of trial, Edna had a very strong heart, did not have high blood pressure, diabetes, or any other underlying medical conditions, and had no need to check on Edna every day because there was no concern that she was at risk for sudden events. James testified that before the incident, Edna did everything herself, cooked her own breakfast, clothed and bathed herself, and walked a long distance to the Parkwood dining room. Dr. Chapman testified that Edna suffered permanent muscle damage and weakness. He agreed that it would be best that Edna no longer live in an independent retirement facility because the initial cause of the event was unexplained and "this could happen again." He also recalled a "physical therapy note" suggesting that Edna "go to skilled nursing also."

Janet explained that Edna's ability to maneuver and get around changed vastly after July 2008, as Edna is now physically confined to a wheelchair and "needs assistance with basically everything" twenty-four hours a day. Although Edna reads the newspaper and plays cards and bingo, Janet and James no longer take Edna to their home because it is "very difficult to transport her," and in arranging for Edna to be present during trial, "hired a medical taxi so that they could push the wheelchair into that and she wouldn't have to transfer." At the time of trial, James explained that Edna was in a skilled nursing facility and her lifestyle had dramatically changed.

41

Edna was no longer able to clothe or bathe herself or walk long distances as she did before the injury, and could no longer cook her own breakfast, or use the bathroom by herself. Janet goes to the facility daily and assists Edna by changing her clothes and soiled clothing, preparing Edna to go to her meals, and making sure everything is taken care of.

In *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 772 (Tex. 2003), the Texas Supreme Court directed that a jury should be instructed that the effect of any physical impairment must be substantial and extend beyond any pain, suffering, mental anguish, lost wages or diminished earning capacity and that a claimant should not be compensated more than once for the same elements of loss or injury. *Id.* Here, the trial court instructed in part:

> Consider the elements of damages listed below and none other. Consider each element separately. Do not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss[.] Do not include interest on any amount of damages you find. Do not include any amount for any condition not resulting from the injury in question.

This instruction substantially comports with the Texas Supreme Court mandate in *Golden Eagle Archery, Inc.*, 116 S.W.3d at 772; *see also Gen. Motors Corp. v. Burry*, 203 S.W.3d 514, 554 (Tex. App.—Fort Worth 2006, pet. denied) (instruction that jury consider the elements of damages listed and none other, consider each element separately, and in answering question jury not award any sum of money on any element if has otherwise, under some other element, awarded sum of money for same loss, "that is, do not compensate twice for the same loss[,]" held to substantially comport with *Golden Eagle*).

Because there is more than a scintilla of evidence to show that Edna suffered a loss of enjoyment of life in her style of living, and because the evidence is not so contrary to the

42

overwhelming weight of the evidence as to be clearly wrong and unjust, we conclude the evidence is legally and factually sufficient to support the jury's award of past and future physical impairment damages.

*Medical Damages*

The jury awarded Edna the sum of $43,108.62 in medical care expenses incurred in the past. Telesis stipulated to this "amount [as] they were reasonable and necessary costs paid in connection with the treatment of Ms. Anderson arising out of the event." At the conclusion of trial, Edna's counsel objected to the inclusion of medical damages as a component of Question 2 and moved for directed verdict on the stipulated medical damages. Telesis countered that although it had stipulated to the amount of the damages, "there is a causal link between that and conduct on the part of Parkwood [that] was not stipulated to." The trial court informed counsel that it would reopen the evidence the following morning and read the stipulation to the jury. Telesis then objected to Question 2, asserting that there was no evidence linking causation of Edna's medical care expenses to Telesis' conduct. The trial overruled the objection.

On appeal, Telesis now complains "[n]o logical basis exists for the jury's implicit conclusion that [Edna] suffered no harm requiring medical treatment due to the fall and her time on the [ground] before an act or omission of Parkwood became significant." It argues, "The medical damages award should be reversed along with the four other categories of compensatory damages." This is almost verbatim the entirety of Telesis' complaint. As Telesis cites no legal authority in support of its complaint, the complaint is improperly briefed. TEX. R. APP. P. 38.1(i). We also note that Telesis' complaint on appeal does not comport with its complaint to the trial court. *See Banda v. Garcia,* 955 S.W.2d 270, 272 (Tex. 1997)(complaint on appeal must be same

43

as that presented in trial court).   An appellate court cannot reverse based on a complaint not raised in the trial court.   *Id.*

Nonetheless, we again observe that the jury concluded by sufficient evidence that Telesis' negligence caused Edna's "injury in question."   We additionally observe that Dr. Chapman testified that it was a fair characterization to say that the length of time Edna was on the floor was the most likely cause of her rhabdomyolysis and, had she been attended to earlier, she would have experienced less muscle damage.   The doctor noted that it did not appear that anything had fallen on Edna or had crushed a limb, she had no fractures, head injury, or acute stroke, and he was confident she had not experienced a cardiac event, and he testified that there was nothing about Edna's condition other than the muscle disintegration she experienced that prevented her from returning to her pre-event physical status.

### *Sympathy*

Telesis complains that "Anderson's family made a pitch for sympathy from the jury through testimony irrelevant to any proper category of damages," and argues, "The law does not countenance awarding compensatory damages based upon such pure sympathy pleas."   Telesis has failed to direct us to any portion of the record where this complaint was preserved in accordance with Rule 33.1.   TEX. R. APP. P. 33.1(a).   Having reviewed the complained-of testimony, we find that Telesis did not object to this testimony during trial.   Therefore, we conclude Telesis has failed to preserve this issue for our consideration.   TEX. R. APP. P. 33.1(a). For the foregoing reasons, Issues Nine and Ten are overruled.

### IV.   GROSS NEGLIGENCE

44

In multiple issues, Telesis challenges the legal and factual sufficiency of the evidence to support the jury's gross negligence findings. Before analyzing the issues, we set out the relevant provisions and standards for finding and reviewing gross negligence.

Gross negligence consists of both objective and subjective elements. *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 137-38 (Tex. 2012)(citations omitted). A plaintiff asserting a gross negligence cause of action must prove by clear and convincing evidence: (1) that when viewed objectively from the defendant's standpoint at the time of the event, the act or omission involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and (2) the defendant had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others. *See id.;* TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(11)(West 2015).

"'Clear and convincing' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(2)(West 2015); *U-Haul Int'l, Inc.*, 380 S.W.3d at 137. "[I]n other words, the plaintiff must show that the defendant knew about the peril, but his acts or omissions demonstrate that he did not care." *La.-Pac. Corp. v. Andrade,* 19 S.W.3d 245, 246–47 (Tex. 1999).

Under the objective component of gross negligence, "extreme risk" is not a remote possibility or even a high probability of minor harm, but rather the likelihood of the plaintiff's serious injury. *U-Haul Int'l, Inc.*, 380 S.W.3d at 137; *Mobil Oil Corp. v. Ellender,* 968 S.W.2d 917, 921 (Tex. 1998). The subjective prong requires that the defendant knew about the risk, but that the defendant's acts or omissions demonstrated indifference to the consequences of its acts.

45

*U-Haul Int'l, Inc.*, 380 S.W.3d at 137-38. Awareness of an extreme risk does not require proof that the defendant anticipated the precise manner in which the injury would occur or be able to identify to whom the injury would befall. *Id*. at 139. The fact that a defendant exercises some care does not insulate the defendant from gross negligence liability. *Ellender*, 968 S.W.2d at 923-24 (citations omitted). Circumstantial evidence may suffice to prove either element of gross negligence. *Boerjan v. Rodriguez*, 436 S.W.3d 307, 311 (Tex. 2014).

Thus, to support her gross negligence claim, Edna was required to show that Telesis was aware that either the failure to check on Parkwood residents who missed a meal or the failure to maintain an operational emergency call unit in Edna's apartment posed an extreme degree of risk, that is, likelihood of harm to Edna, and had actual, subjective awareness of the risk involved in failing to check on a Parkwood resident who missed a meal or leaving a non-working emergency call unit in a Parkwood resident's apartment, but nevertheless proceeded to fail to check on Edna or to repair her non-working emergency call unit with conscious indifference to Edna's safety or welfare.

*Clear and Convincing Evidence Standards of Review*

We employ heightened standards of review when a sufficiency challenge is made on evidence to be established by clear and convincing evidence. "A legal sufficiency review of a finding required to be based on clear and convincing evidence must take into consideration whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the matter required to be established by clear and convincing evidence." *HCRA of Texas, Inc.*, 178 S.W.3d at 868, *citing In re J.F.C.,* 96 S.W.3d 256, 264–68 (Tex. 2002)(citations omitted). We consider all of the evidence in the light most favorable to the finding to determine

46

whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *See In re J.F.C.,* 96 S.W.3d at 266. That is, if after conducting our legal sufficiency review of the record evidence, we determine that no reasonable fact finder could form a firm belief or conviction that the matter that must be proven is true, then we must conclude that the evidence is legally insufficient. *Id.*

In conducting a factual-sufficiency review of evidence to be proven by clear and convincing evidence, we must give due consideration to evidence that the fact finder could reasonably have found to be clear and convincing. *In re J.F.C.,* 96 S.W.3d at 266. Our inquiry is whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the allegations. *Id.* We consider whether disputed evidence is such that a reasonable fact finder could not have resolved that disputed evidence in favor of its finding. *Id.* at 266-67. Evidence is factually insufficient if, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction. *Id.*

*Procedural Background*

In the trial court, Telesis sought, and the trial court denied, a directed verdict on Edna's gross negligence and malice claims on the basis she had failed to present evidence of an actual awareness of an extreme degree of risk considering the probability of the harm. Telesis objected to the trial court's "Question 5" on the basis that there was no evidence of a subjective awareness by a Parkwood vice-principal regarding conduct that would involve an extreme degree of risk considering the probability of harm. The trial court overruled the objection and denied Telesis'

47

tendered instruction, which included a definition of "vice-principal." Telesis did not object to Question 3 of the trial court's charge, which asked and instructed:

> Do you find by clear and convincing evidence that the harm to Edna Anderson found in response to Question 1, if any, resulted from gross negligence?
>
> "Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.
>
> "Gross negligence" means an act or omission by Parkwood Retirement Community,
>
> (a) which when viewed objectively from the standpoint of Parkwood Retirement Community at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and
>
> (b) of which Parkwood Retirement Community has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

To this question the jury answered, "Yes." In response to Question 4, which asked the jury what sum of money, if any, should be assessed against Parkwood Retirement Community and awarded to Edna as exemplary damages for the conduct found in response to Question 3, the jury awarded exemplary damages of $1,680,000.[5]

In its motion for new trial, Telesis complained the evidence was factually insufficient to support either the elements of gross negligence or the jury's finding that Parkwood's gross negligence proximately caused injury to Edna. It specifically complained the evidence was insufficient to show that Nafziger or anyone else acting for Parkwood had any objective or subjective awareness of an extreme risk of serious injury to Edna, or that Nafziger had any

---

[5] In its judgment, the trial court awarded exemplary damages in the sum of $587,217.24.

48

subjective awareness that Edna was at risk of falls or collapses that were likely to result in serious injury in the event that help was not immediately forthcoming.

*Analysis*

In Issues Eleven and Twelve respectively, Telesis argues there was no clear and convincing evidence that was legally or factually sufficient to show Parkwood's gross negligence caused harm to Edna. We address these issues together.

We first note that Edna was not required to show that Telesis' "gross negligence" caused Edna's harm. Indeed, it has been said, "What lifts ordinary negligence into gross negligence is the defendant's mental attitude." *Newman v. Tropical Visions, Inc.,* 891 S.W.2d 713, 721 (Tex.App. –San Antonio 1994, writ denied)(citations omitted). Ordinary negligence is a prerequisite to establish gross negligence. *Hall v. Stephenson*, 919 S.W.2d 454, 467 (Tex.App. – Fort Worth 1996, writ denied). We have already determined that Edna presented legally and factually sufficient evidence to warrant the jury's verdict finding Telesis' negligence caused her harm. However, evidence of simple negligence is not enough to prove either the objective or subjective elements of gross negligence. *See Ellender,* 968 S.W.2d at 921; *HCRA of Texas, Inc.*, 178 S.W.3d at 873. We therefore interpret and address Telesis' Issues Eleven and Twelve as challenges to the legal and factual sufficiency of the evidence to prove gross negligence by clear and convincing evidence and disregard Telesis' contentions regarding the sufficiency of the evidence to support a finding of causation of "ordinary" negligence. As Telesis did not challenge the sufficiency of the evidence to support the objective component of gross negligence, we further restrict our review to the sufficiency of the evidence to support the jury's finding regarding the subjective component of gross negligence.

49

In examining proof of the subjective component of gross negligence, courts focus on the defendant's state of mind, examining whether the defendant knew about the peril caused by his conduct but acted in a way that demonstrates he did not care about the consequences to others. *Reeder v. Wood Cnty. Energy, LLC*, 395 S.W.3d 789, 796 (Tex. 2012)(citations omitted) (non-personal injury case). Determining whether an act or omission involves peril requires "an examination of the events and circumstances from the viewpoint of the defendant at the time the events occurred, without viewing the matter in hindsight." *Id.*

Reginald Austin, Telesis' Food Services Director at Parkwood at the time of Edna's incident provided testimony regarding the meal no-show check that was not performed. Austin, a fourteen-year employee at Parkwood, explained the meal no-show check procedures, which included comparing the meal no-show list to a list "in front of the office" noting that a resident would not be present for a meal, and explained that "a lot of times no one on the staff went to check on somebody because a lot of times there wasn't a manager there when we checked." Austin would then call no-show residents and would go to the apartment of those residents who could not be contacted by phone. On the date that Edna missed her meal, Austin was not working and his cook bore his responsibilities for the meal no-show check but did not perform them. Austin disagreed that the meal no-show check was a safety feature but was a courtesy "just in case" but understood the procedure to serve the purpose of notifying a resident's family members if the resident was found to have died. Austin recalled an occasion many years earlier regarding a resident who had been seen being transported to the hospital but returned to her apartment that same night. Believing that the resident was still at the hospital when she did not appear for her

50

meal, no one from Parkwood checked on her. The resident was later found to have slipped and fallen in her apartment and had died. The cook who failed to check on Edna did not testify.

Nafziger described the meal no-show check as "a practice that we would hope would catch something very bad from happening before more than a day goes by." She did not believe the practice was a safety feature but when asked whether the cook's failure to check on Edna was negligence, Nafziger answered, "I would probably have to say yes." Nafziger also admitted that it was possible to foresee in certain circumstances that negligently failing to check on someone who had fallen could lead to great harm, including death. Nafziger denied knowledge of the incident described by Austin where a Parkwood resident was found dead after failing to perform a meal no-show check. However, the evidence shows that she knowingly did not test the emergency call units weekly in accordance with the manufacturer's warnings, she knew that residents may not be aware when the system is not operational as she had discovered non-working systems under such circumstances, she admitted that no policy for documenting injuries or incidents exists other than her entering her own notations on her calendar, she acknowledged that on one occasion she had been notified that Edna's emergency call unit was not operational, and she stated that it was her practice to throw away units without performing tests to verify whether they are operational.

Viewing all of the evidence in the light most favorable to the jury's gross negligence finding, we conclude that Edna proved by clear and convincing evidence, such that the jury could reasonably form a firm belief or conviction about the truth of the matter, that Nafziger objectively knew that the failure to test and keep the emergency call units properly functioning involved the likelihood of serious injury to Parkwood's residents, considering the probability and magnitude of

51

the potential harm to those residents, and that Nafziger subjectively knew of the risk involved, but nevertheless proceeded with conscious indifference to the safety or welfare of Parkwood's residents, including Edna. Because the evidence to support the jury's gross negligence finding is supported by legally-sufficient clear and convincing evidence, Issue Eleven is overruled.

Giving due consideration to evidence that the fact finder could reasonably have found to be clear and convincing, inquiring whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the allegations, and considering whether disputed evidence is such that a reasonable fact finder could not have resolved that disputed evidence in favor of its finding, we conclude, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is not so significant that the fact finder could not reasonably have formed a firm belief or conviction. Because the jury's gross negligence finding is supported by clear and convincing factually-sufficient evidence, Issue Twelve is overruled.

In Section Six of its brief, Telesis intertwines without delineation Issues Thirteen, Fourteen, Fifteen, Sixteen, and Seventeen. In its "Issues Presented" provided at the outset of its brief, Telesis initially complains in Issues Thirteen and Fourteen that, given the legal and factual insufficiency of clear and convincing evidence to support the finding of gross negligence, we should set aside the exemplary damages and render judgment or remand the case accordingly. As we have determined that the jury's gross negligence finding is supported by legal and factual sufficient evidence under a clear and convincing burden of proof, Issues Thirteen and Fourteen are overruled.

52

In Issue Fifteen, Telesis asserts that we should reverse the punitive damages and render judgment because the trial court erroneously refused to instruct the jury regarding the necessity of acts or omissions of a Telesis vice-principal for gross negligence punitive damages. We observe that although Telesis tendered to the trial court a requested instruction that was rejected, Telesis did not object to the trial court's gross negligence question or instruction set out in Question 4 on the basis that it did not include a vice-principal instruction but rather objected on the basis that evidence of subjective awareness by a vice-principal was lacking. Unlike the negligent undertaking instruction to which Telesis objected and tendered a requested question and instruction, in this instance, Telesis tendered a proposed gross negligence instruction but did not object to Question 3 of the trial court's charge regarding gross negligence as tendered to the jury. TEX. R. APP. P. 33.1(a); TEX. R. CIV. P. 274; *see Thota*, 366 S.W.3d at 691 (party's objection to submitted charge along with submission and presentation of proposed charge to the trial court according to its theory of the case sufficient to notify trial court of its belief that evidence does not support the challenged instruction). As Telesis has failed to properly preserve or argue its complaint, Issue Fifteen is overruled.

In Issues Sixteen and Seventeen, Telesis argues that that we should reverse the jury's punitive damages award and render judgment because the evidence is legally and factually insufficient in showing an act or omission of a Telesis vice-principal constituting gross negligence. In its argument, however, Telesis does not present the issues it previously identified in its "Issues Presented" but rather sets out four sub-issues complaining of legal and factual insufficiency under a burden of proof of clear and convincing evidence to show its vice-principle committed a grossly-negligent act or omission regarding Parkwood's meal no-show check and emergency call

53

systems, and a fifth sub-issue complaining that the trial court erred in refusing a proper instruction regarding the vice-principal requirement for gross negligence punitive damages. Arguments in support of Issues Thirteen and Fourteen, which we have overruled, appear also to have been subsumed within the arguments of Issues Sixteen and Seventeen in Telesis' brief but are not distinctly set out as such.

In the body of its argument, Telesis first argues there is no evidence that accords Parkwood's cook, Mitzy Huckaby, the status of a vice-principal, therefore, no punitive damages are appropriate based upon the negligence related to the meal-no show. Telesis next contends, "The only employee related to the call system negligence claim who could be argued by Plaintiff to be a vice-principal is Mary Nafziger." Telesis seems to argue that although Nafziger was the director of Parkwood, that position was insufficient to qualify her as one who "ran a 'department or division'," and vigorously asserts that the jury's gross negligence finding and punitive damage award must be stricken.[6] Again without citation to any legal authority, Telesis then argues that coupling negligence as to the meal no-show check with the vice-principal acts of Nafziger in relation to the emergency call system because the vice-principal must commit the grossly negligent acts or omissions causing damages. TEX. R. APP. P. 33.1(a), 38.1(i). Telesis concludes its "argument" by asserting that Edna failed to plead, argue, or prove "the other theoretical means of supporting gross negligence punitive damages . . . [relating to the] hiring [of] an unfit agent or

---

[6] Telesis alternatively argues that if the evidence is sufficient to qualify Nafziger as a vice-principal but the evidence is insufficient as to the negligent causation of harm arising in relation to the emergency call system, the punitive damages cannot survive. As we have concluded the evidence is sufficient to support the jury's negligent causation finding, we need not address this alternative argument.

54

authorizing or ratifying [such] agent's gross negligence" and must persuade this Court that she satisfied the vice-principal requirement.

A corporation may be liable in punitive damages for gross negligence only if the corporation itself commits gross negligence. *Ellender,* 968 S.W.2d at 921. However, a corporation can act only through "agents of some character[.]" *Id.* (citation omitted). Thus, a corporation can be held to have committed acts of gross negligence by the actions of a vice-principal. *Hammerly Oaks, Inc. v. Edwards,* 958 S.W.2d 387, 388-89 (Tex. 1997). The term "vice-principal" encompasses: (a) corporate officers; (b) those who have authority to employ, direct, and discharge servants of the master; (c) those engaged in the performance of non-delegable or absolute duties of the master; and (d) those to whom the master has confided the management of the whole or a department or a division of the business. *Ellender,* 968 S.W.2d at 922. A corporation is also liable for punitive damages if it authorizes or ratifies an agent's gross negligence or if it is grossly negligent in hiring an unfit agent. *Id.* at 921.

As opposed to looking only to a single detail or group of factors, in determining whether a corporation itself is grossly negligent, we must look to the totality of the surrounding facts and circumstances. *Id*. at 922. "Whether the corporation's acts can be attributed to the corporation itself . . . is determined by reasonable inferences the factfinder can draw from what the corporation did or failed to do and the facts existing at relevant times that contributed to a plaintiff's alleged damages." *Id*. If the totality of the evidence is sufficient to lead to the inference that agents of the corporation were aware of the risk to which others were being exposed, such an inference is sufficient to support corporate liability. *Id*. at 924.

55

We agree the evidence does not support a finding that Ms. Huckaby, the cook on duty on the day Edna was discovered, was a vice-principal of Telesis. However, there is ample evidence that Mary Nafziger is Telesis' vice-principal under these facts. Nafziger was Parkwood's director, the person to whom everyone at Parkwood reported on a daily basis, the only person who was responsible for testing and rendering the emergency call units operational, and the person who twelve years earlier had read the warnings that the emergency call unit, recalled that the manual instructed that the units be tested weekly and included a weekly checklist for such testing, and admitted that weekly tests were not performed on the emergency call units. For twelve years of her employment at Parkwood, Nafziger alone was responsible for working with the emergency call systems and changing the batteries in them, including the period when Edna was a resident at Parkwood. According to Nafziger, she believed that "corporate" probably had informed her she did not need to test the emergency call units weekly.

There was unobjected-to evidence that a Parkwood housekeeper had informed Janet that she had reported that Edna's emergency call device had not been working.[7] Parkwood's maintenance supervisor also testified that Andrea, a Parkwood housekeeper, had reported four times to Parkwood's management that Edna's emergency call unit was not working. Nafziger recalled an occasion when Anderson's emergency call unit had been reported but could not recall when the report had been made.

Nafziger agreed that the units could malfunction not only due to depleted batteries but also because of electrical surges or damage from being dropped. Nafziger explained that work orders

---

[7] Inadmissable hearsay admitted without objection shall not be denied probative value merely because it is hearsay. TEX. R. EVID. 802.

56

are not created for malfunctioning emergency call systems, and that she would check the emergency call box herself. She also purchased batteries for the pendants and replaced them, and said she had changed Edna's batteries three months earlier. Nafziger expressly stated, "I take responsibility for making sure that [the emergency call unit is] in a working mode." When asked if it is foreseeable that if she failed to check the unit, it may not be working, Nafziger acknowledged that it was a possibility. Nafziger stated that she knew of three or four occasions when she had gone to change batteries in emergency call units and found them to not be operational. Nafziger threw away Edna's emergency call unit box away on the night Edna was discovered, without testing any components for functionality, because she understood from her Parkwood's maintenance supervisor Dennis Jackson, the on-site responder, that it was felt there was a problem with Edna's "emergency box," a component of the system which is plugged into an outlet and contains a backup battery. Nafziger kept Edna's pendant component of the emergency call system but replaced Edna's emergency call unit that she threw away.

Nafziger admitted that she informed James and Janet that Parkwood's back-up system of checking on residents had broken down and apologized for not checking on Edna "as we should." Nafziger admitted that she realized that if Edna had not been able to reach her family on the phone, she could have died before the next day because she had not been checked on.

Because legally and factually sufficient clear and convincing evidence shows an act or omission of Telesis' vice-principal constituted gross negligence, Issues Sixteen and Seventeen are overruled.

## V. SPOILATION INSTRUCTION

In Issue Eighteen, Telesis initially complains the trial court's charge included an improper spoliation instruction which probably caused the rendition of an improper verdict. In its charge, the trial court instructed the jury that Parkwood Retirement Community had a duty to exercise reasonable care to preserve the call box and a list of replacement units, and that it may presume from the destruction of these items of evidence that they would have been unfavorable to Parkwood. Of course, Telesis did not tender or request a spoliation instruction.[8]

*Preservation*

Edna counters that Telesis did not preserve its specific spoliation complaints. Telesis made a single objection to the trial court's spoliation instruction:

> [O]n the grounds that there is not a proper predicate in the evidence, and specifically in the Texas Supreme Court as required in the *Wal-Mart v. Johnson* case that Parkwood knew or should have known that there was a substantial chance that a claim would be filed and that the evidence in Parkwood's possession and control would be material or relevant to that claim. We don't believe that the evidence supports that, and so we would object to that instruction.[9]

---

[8] Interestingly, Edna's amended pretrial jury charge proposed this instruction:

> "You are instructed that, when a party has possession of a piece of evidence at a time he knows or should have known it will be evidence in a controversy, and thereafter he disposes of it, alters it, makes it unavailable, or fails to produce it, there is a presumption in law that the piece of evidence, had it been produced, would have been unfavorable to the party who did not produce it. If you find by a preponderance of the evidence that Parkwood had possession of the Emergency Call System from Edna Anderson's apartment at a time it knew or should have known it would be evidence in this controversy, then there is a presumption that the Emergency Call System from Edna Anderson's apartment if produced, would be unfavorable to Parkwood[.] This presumption may be rebutted by Parkwood with the evidence of a reasonable explanation for the non-production of the evidence. Approved by Cresthaven Nursing Residence v. Freeman, 134 S.W.3d 214,225 (Tex. App. Amarillo 2003)(no pet.)[.]"

In its brief, Telesis, too, cites this specific instruction and case and asserts, "Use of that approach would have allowed the jury to assess the circumstances facing Nafziger on July 6, 2008, and weigh the overall actions of Defendants to decide whether a duty existed."

[9] In its motion for new trial, Telesis complained that the trial court erred in submitting the spoliation instruction generally, and specifically on bases that: (1) it instructed the jury that it had a duty to preserve "two items" when a factual dispute exited regarding whether it knew or should have known of a substantial chance of litigation and

58

A party objecting to a charge must point out distinctly the objectionable matter and the grounds of the objection. TEX. R. CIV. P. 274; *see also* TEX. R. CIV. P. 272 (all objections not presented to the court in writing or dictated to the court before the charge is read to the jury are considered waived); TEX. R. APP. P. 33.1. The Texas Supreme Court has noted that the important "purpose of Rule 274 is to afford trial courts an opportunity to correct errors in the charge by requiring objections both to clearly designate the error and to explain the grounds for complaint." *Burbage v. Burbage*, 447 S.W.3d 249, 256 (Tex. 2014), *quoting Wilgus v. Bond*, 730 S.W.2d 670, 672 (Tex. 1987). Ultimately, the test is "whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling." *Burbage*, 447 S.W.3d at 256, *quoting State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992).

Within Issue Eighteen of its appellate brief, Telesis complains in five sub-parts that the trial court improperly determined and instructed the jury that Telesis had a duty to preserve two items and had improperly instructed the jury that Telesis breached its duty to preserve two items, that it erred in using a spoliation instruction against it concerning a "'list of replacement units' when there was no evidence such a list ever existed," that the instruction improperly and conclusively instructed the jury that Telesis' discarding of potential evidence was more significant than the discarding of evidence under Edna's control, and improperly foreclosed Telesis' ability to rebut its adverse presumption. None of these specific complaints were presented to the trial court.

---

destroyed items that would have been material to the litigation; (2) no evidence that a list of replacement units ever existed; (3) it did not allow the jury to consider evidence rebutting the presumption that the destroyed evidence was unfavorable to Telesis; and (4) undisputed evidence showed Telesis promptly tried to preserve potential evidence.

Because Telesis did not present these specific complaints to the trial court and they did not form the basis of Telesis' objection to the trial court, they are not preserved for our consideration.

The specific ground on which Telesis objected to the spoliation charge was its assertion that the predicate for a spoliation instruction was not supported by evidence that there was a substantial chance that Edna would pursue a claim and that the evidence in Telesis' possession and control would be material or relevant to that claim. This is the only ground preserved for our consideration on appeal. To the extent Telesis has presented legal authority and argument within Issue Eighteen bearing on its preserved complaint as may be enrobed within its broad, general assertion that the trial court "erred in including a spoliation instruction" in its charge, we restrict our analysis to a determination of whether there is evidence that there was a substantial chance that Edna would pursue a claim and that the evidence within Telesis' possession and control would be material and relevant thereto.

*Spoliation Analytical Framework*

Evidentiary matters are to be resolved by the trial court, and discovery matters, too, are within the trial court's sole province.[10] *See Brookshire Bros. Ltd. v. Aldridge*, 438 S.W.3d 9, 18, 19-20 (Tex. 2014)(citations omitted unless noted). Spoliation is both an evidentiary concept and, as it results in the failure to produce discoverable evidence, a particularized form of discovery abuse. *Id*. at 20. Therefore, it is the trial court that "must determine whether a party spoliated

---

[10] After this case was submitted for our consideration, the Texas Supreme Court crafted an analytical framework for finding spoliation and imposing an appropriate remedy in the event of such finding. *See Brookshire Bros. Ltd. v. Aldridge*, 438 S.W.3d 9, 18, 19-20 (Tex. 2014)(citations omitted unless noted). Neither the trial court nor the parties had the benefit of this framework at relevant times prior to submission of the case on appeal.

evidence and, if so, impose the appropriate remedy." *Id*. The placement of this responsibility on the trial court is key to ensuring the jury's focus remains on the merits of the case. *Id*.

Texas courts necessarily enjoy wide latitude in determining the proper remedy for acts of discovery abuse, including spoliation. *Id*. at 18. Regarding spoliation, courts have broad discretion to utilize a variety of remedies, including a spoliation instruction. *Id*. at 17. A spoliation instruction "is given to compensate for the absence of evidence that a party had a duty to preserve[.]" *Wal-Mart Stores v. Johnson*, 106 S.W.3d 718, 724 (Tex. 2003). Although important, the very purpose of a spoliation instruction remedy is to nudge or tilt the jury toward a finding that is adverse to the alleged spoliator. *Brookshire Bros., Ltd.*, 438 S.W.3d at 17. The presentation of evidence that emphasizes the spoliator's wrongful conduct magnifies this nudging or tilting. *Id.* Often, the unfortunate consequence of submitting a spoliation instruction that constitutes too difficult a hurdle for a spoliator to overcome is the ending of the litigation. *Id.*

Evidence spoliation is a serious issue. *Brookshire Bros., Ltd.*, 438 S.W.3d at 16. The failure to reasonably preserve discoverable evidence may significantly hamper the ability of the nonspoliating party to present its claims and defenses. *Id.*, *citing Wal-Mart Stores*, 106 S.W.3d at 721. Spoliation of evidence can also undermine the "truth-seeking function of the judicial system and the adjudicatory process[.]" *Brookshire Bros., Ltd.*, 438 S.W.3d at 16-17. The Texas Supreme Court has acknowledged that a missing piece of evidence can be irreplaceable, and has observed, "Testimony as to what the lost or destroyed evidence might have shown will not always restore the nonspoliating party to an approximation of its position if the evidence were available; sometimes a picture is indeed worth a thousand words." *Id*. at 17.

61

"[A] party alleging spoliation bears the burden of establishing that the nonproducing party had a duty to preserve the evidence." *Brookshire Bros., Ltd.*, 438 S.W.3d at 20, *citing Wal-Mart Stores*, 106 S.W.3d at 722. A duty to preserve evidence arises only when a party knows or reasonably should know that there is a substantial chance that a claim will be filed and that evidence in the party's possession or control will be material and relevant to that claim. *Brookshire Bros., Ltd.*, 438 S.W.3d at 20, *citing Wal-Mart Stores*, 106 S.W.3d at 722. The Texas Supreme Court has explicitly recognized that a party seeking a spoliation remedy must demonstrate that the other party breached its duty to preserve material and relevant evidence, and that such duty is inherently breached by failing to exercise reasonable care to preserve evidence. *Brookshire Bros., Ltd.*, 438 S.W.3d at 20, *citing Wal-Mart Stores*, 106 S.W.3d at 722.

*Analysis*

We employ an abuse of discretion standard when reviewing a trial court's imposition of a spoliation remedy, including its submission of a spoliation instruction to the jury, and when evaluating a trial court's admission of evidence. *Brookshire Bros., Ltd.*, 438 S.W.3d at 27. To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241– 42 (Tex. 1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). Merely because a trial court may decide a matter within its discretion in a different manner than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *Id.* at 242. A trial court's error is reversible only if it probably caused the rendition of an improper judgment. *Brookshire Bros., Ltd.*, 438 S.W.3d at 29. "[I]f a spoliation

instruction should not have been given, the likelihood of harm from the erroneous instruction is substantial, particularly when the case is closely contested." *Brookshire Bros., Ltd.*, 438 S.W.3d at 29, *quoting Wal-Mart Stores*, 106 S.W.3d at 724.

The evidence at trial showed that after Janet had called Parkwood's emergency line and Dr. Chapman, and after James had dialed 9-1-1, and while emergency technicians were tending to Edna in her apartment, a Telesis employee, Dennis Jackson, entered the apartment and informed James that he was replacing the emergency call system because it did not work. A housekeeper informed Janet that she had reported that Edna's emergency call device was not working on several occasions while making Edna's bed and had reported that the unit was not operating. Howard Allred, the maintenance supervisor, testified that Andrea, a housekeeper, had informed him that she had reported on four occasions that Edna's emergency call device was not working, and there was evidence that Telesis' CEO had threatened to terminate Allred's employment if he notified anyone of those reports. Nafziger admitted that a housekeeper, Andrea, had informed her on one occasion that Edna's emergency call unit was not working.

Edna was hospitalized on July 6, 2008, and was discharged on July 9, 2008. James and Janet testified that when they met with Nafziger after Edna left the hospital, Nafziger admitted to them that the emergency call system did not work. Although Nafziger did not recall informing James and Janet that the emergency call unit had failed, she was the only person responsible for the programming, maintenance, and testing of the emergency call units, and admitted that she did not test the units weekly in accordance with the manufacturer's warnings but, rather, only on an annual basis. Nafziger admitted previously discovering that emergency call systems were not operational when residents had not been aware of this fact. Nafziger did not test the pendant

63

component of Edna's emergency system and threw away Edna's base transmitter unit, purportedly before a corporate risk manager requested that she save the device, but admitted that there was no way to know whether Edna's system worked without testing it.

We conclude the trial court did not err in overruling Telesis' single objection to the spoliation instruction on the sole basis that the evidence did not establish that it knew or should have known that there was a substantial chance that a claim would be filed and that the evidence in its possession and control would be material or relevant to that claim, or in giving the spoliation charge. The evidence shows and supports the trial court's conclusion that Telesis knew or reasonably should have known that there was a substantial chance that Edna would file a claim, and that the emergency call unit, specifically the transmitter from Edna's room that was replaced before she was transported from her apartment to the hospital and was then thrown away by Nafziger, would be material and relevant to that claim. Because the trial court did not err, Issue Eighteen is overruled.

## CONCLUSION

The trial court's judgment is affirmed.


YVONNE T. RODRIGUEZ, Justice

March 20, 2015

Before McClure, C.J., Rivera, and Rodriguez, JJ.
Rivera, J., not participating

64